PRESENT, CHEW, PRESIDENT, M'KEAN, SHIPPEN, YEATES, SMITH AND BIDDLE, JUSTICES.

# James Hannum and George Harlam, plaintiffs in error *against* Joseph Spear, defendant.

### S. C. 2 Dall. 291.

Lands aliened *bona fide* by executors under a power to sell for payment of debts, purchaser may defend himself against future debts of the testator. Aliter where the power is for payment of legacies, for in such case the debts continue as liens on the lands sold.

THIS cause came before the court on a bill of exceptions, agreed by counsel to be sealed by M'Kean C. J., on a trial had before him and Justice Yeates, at West Chester, on the 28th April 1794, when a verdict was found for Spear, the then plaintiff.

The action was brought in debt, for 939l. 8s. 10d., on a bond, dated 29th November 1784, conditioned for the payment of 469l. 14s. 5d. on the 29th April 1785. The defendants pleaded payment, with leave to give the special matters in evidence. The plaintiff replied *non solverunt* and issue.

After a verdict for the then plaintiff for 735l. 2s. debt, and judgment thereon in the Supreme Court, a writ of error was brought to July term 1795.

The substance of the bill of exceptions was as follows. " The defendants on the trial gave in evidence to support the " issue on their part, that the plaintiff, together with Jacob " Chandler, now deceased, were executors of the testament " and last will of Elizabeth Ring, and as executors under the " powers given to them by the will, (*prout* will,) had, on the " 29th April 1784, sold to the said James Hannum 140 acres " of land in West Marlborough township, in Chester county, " for 8l. 19s. 6d. per acre, (*prout* conditions of sale.) That on " the 29th November 1784, the said executors made a deed to " the said Hannum for the said lands, (*prout* deed,) and that " on the same day the said bond was given by the defendants " to the plaintiffs for part of the purchase money.

" The defendants gave also in evidence, that Elizabeth " Ring died indebted to several persons, in particular to " Thomas Gibson and Hannah his wife, in 1256l. 4s. 4½d. " more than she left personal estate sufficient to satisfy, of " which debt at the time of the purchase aforesaid by the said " James Hannum, he had no notice, and for which sum of " money the said Gibson *and wife, subsequent to the    [*554 " 29th November 1784, the date of the deed, instituted

[Hannum *v.* Spear.]

"a suit in the Court of Common Pleas of Chester county,
"and on the 16th September 1788, recovered judgment with
"costs, against the estate of Elizabeth Ring aforesaid, which
"judgment was affirmed in the Supreme Court.

"The defendants further gave in evidence, that after they
"had received notice of the several debts aforesaid against
"the estate of the said Elizabeth Ring, and in particular of
"the claim of Gibson and wife, to wit, in the end of 1785,
"or beginning of 1786, the said Hannum told the plaintiff
"he was willing and ready to pay the consideration money
"for the said lands, provided he could have a good title se-
"cured to him therefor; but as he was not safe in paying
"more money on account of the debts aforesaid against the
"estate of the said Elizabeth Ring, he then offered to the
"said plaintiffs, if they would return him 126l. 6s., the
"money he had paid them, (which was paid after November
"1784, and before 1786,) they should have the lands again.

"Whereupon the counsel for the defendants insisted on
"their behalf, that the aforesaid debt due from Elizabeth
"Ring to Gibson and wife, was a lien upon the real estate
"sold as aforesaid, and that the plaintiffs could not make a
"title to the said James Hannum for the said lands, and that
"the consideration of the said bond failed; and therefore the
"defendants were entitled to a verdict, and the said counsel
"did pray the said justices, to allow the said matters and
"proof to be sufficient to entitle the defendants to a verdict.

"But the counsel for the plaintiff insisted, that the said
"matters and evidence were not sufficient to entitle the de-
"fendants to a verdict; and did insist, that together with the
"tract of land so purchased by the said James Hannum, two
"other tracts of land were mortgaged by Nathaniel Ring and
"the aforesaid Elizabeth his wife, to Joseph Parker, by deed
"dated 24th July 1765, for payment of 691l. 10s.; that one
"half of the purchase money was agreed by the said James
"Hannum to be paid to the plaintiffs in one month after the
"sale, (*prout* conditions of sale;) that if the said James had
"complied with such his engagement, the said executors
"could have discharged the said mortgage on the three tracts
"of land aforesaid, the one half of the purchase money being
"628l. 2s. 2d., or thereabouts, and the sum due on the said
"mortgage being 832l. 1s. 6d., or thereabouts; that the said
"James failed in complying with his engagement in that par-
"ticular, having paid no money till the fall of 1784, when a
"deed was made to the said James Hannum, by the execu-
*555] "tors of the said Elizabeth Ring, of the pre*mises
"subject to the said mortgage; and the said James
"then entered into an engagement with the plaintiffs, dated
"29th November 1784, to pay the said mortgage of the said
"three tracts of land to the representatives of Joseph Parker,
"and to procure by the 29th of April then next, a release of

[Hannum *v.* Spear.]

" the said mortgage of the three tracts (*prout* bond of indem-
" nity.)

" The counsel for the said plaintiff further shewed in evi-
" dence, that the said James Hannum did not pay the mort-
" gage, or obtain the release aforesaid; and that a suit was
" afterwards brought on the said mortgage, and a mill and the
" said three tracts of land were sold by the sheriff of the said
" county for 1302l. That the said Gibson, the creditor of the
" said Elizabeth Ring, told the said James Hannum, that
" there should be nothing wanting that he or his wife could
" do, to strengthen the title of the said James to the said
" lands; and the said counsel insisted, that the consideration
" of the bond had not failed, unless through the default of
" the said James Hannum; that if the said James had done
" what he covenanted to do, the said executors could have
" made him a good and indefeasible title to the lands so pur-
" chased by him; that by compliance with his covenants, he
" might have secured to himself the said lands sold to him
" by the executors; and that the debt due from Elizabeth
" Ring to Gibson and wife, was not a lien upon the lands sold
" as aforesaid, but that the title made by the said executors
" to the said James Hannum was a good title in fee.

" And the said justices did declare and deliver their opinion
" to the jury, that the several matters produced and proved
" on the part of the defendants, were not sufficient to bar the
" said Joseph Spear of his said action against the said defend-
" ants, and that the debt due from the said Elizabeth Ring to
" the said Thomas Gibson and Hannah his wife, was not a
" lien upon the lands sold as aforesaid; but that the convey-
" ance made by the said executors, under the will of the said
" Elizabeth Ring, to the said James Hannum, for the said
" lands, passed a good title in fee simple, and with that di-
" rection left the same to the jury.

" The counsel for the said defendants excepted to the said
" opinion of the court, and insisted that the several matters
" produced and proved were sufficient to bar the plaintiff.

" The jury gave a verdict for the plaintiff for 735l. 2s. debt,
" and six pence costs.

" Signed and sealed by consent of counsel on both sides,
" 17th July 1795.

　　　　　　　　　　"THO: M'KEAN." [L. S.]

*The following is an abstract from the will of Eliza-　[*556
beth Ring, dated 17th January 1784, referred to in the
forgoing bill of exceptions:—

" And now for settling my temporal estate. First, I will,
" that all my just debts, &c. be paid. I give unto my grand-
" son Jacob Chandler, my grist and saw mill, with the land on
" that side of the road in fee; and I do in consideration there-
" of, will and allow, that the said Jacob Chandler shall pay
" unto widow Norris all the mortgage demands that I owe

[*Hannum v. Spear.*]

"her. I give to Joseph Spear the plantation whereon I live
"in fee, he paying 300l. besides what he has paid, towards
"discharging my just debts. And I will and allow my plan·
"tation, called the Indian Fields, (the lands sold to James
"Hannum) to be sold by my executors, at what time they see
"best convenient after my decease, and what will remain
"from the sale thereof, I allow to be divided in proportion
"among the legatees after all the legacies is paid. And I
"allow all my personal estate to be sold by my executors and
"divided among my legatees. I appoint the above named
"Joseph Spear and Jacob Chandler, to be the executors of
"this my last will," &c. In the former part of the will, she
had devised several legacies amounting to 380l.

The conditions of the sale of the Indian Fields Tract, dated
29th April 1784, were, that "one half of the purchase money
"should be paid in one month, and the other half, with in-
"terest, in twelve months, giving security if required. The
"executors to give a sufficient deed in fee, when one half of
"the purchase money should be paid."

The bond of indemnity from the defendants to the execu-
tors, dated 29th November 1784, was in the penalty of 2000l.

"It recited the mortgage to Parker, and Hannum cove-
"nanted thereby to take it on himself, the same to go in part
"of his purchase money, and also to procure a release of the
"other two tracts from the mortgage, by the 29th April then
"following, and to indemnify the executors against all dam-
"ages and costs on the mortgage."

The case was argued with much ability, on the 27th July
and 25th August last, in the Court of Errors and Appeals, by
Messrs. Lewis, Tilghman, J. B. M'Kean and J. Ross, for the
plaintiffs in error; and by Messrs. Ingersoll and Wilcocks, for
the defendant. The reporter was not present during those
arguments, having sat at Nisi Prius in the decision of the
cause; but having been favoured with the notes of two of the
judges who attended, he submits the following extract, as
containing the general outlines of the reasons offered on both
sides.

*557]    *The plaintiffs in error insisted, that the executors
on the face of the will, had full notice of the fund
appropriated by the testatrix, for the payment of Parker's
mortgage, viz. the lands devised to Chandler, which were
subjected to the payment thereof. So unmindful, however,
were they of their trust, as to attempt to raise the money from
the sale of the Indian Fields Tract. Lands in England were
not bound for the payment of simple contract debts after the
death of the party, nor even for specialty debts in the hands
of a devisee, until the stat. of 3 and 4 W. and M. c. 14, which
created a lien from the time of the suit brought. 3 Bac. Ab.
25, 26. Carth. 245. That statute made lands liable in the
hands of a devisee, in the same manner as if they had de-

[Hannum v. Spear.]

scended to the heir. Our municipal acts were intended to reach much further; but previous to their being enacted, lands in Pennsylvania in the hands of heirs or devisees, could not be taken in execution for the payment of debts.

The most early act on this subject is to be found among the laws agreed on in England in 1682, § 14, by which all lands and goods were subjected to pay debts, except where there was legal issue; and then, all the goods, and one third of the lands only. Appen. to Prov. Laws, ed. 1775, pa. 7.

The next act, cap. 51, (Appen. 7) subjects one half of the lands to the payment of debts, provided they were brought before the debts contracted.

Then came the act, cap. 119, (Appen. 9) which directed how the estate of a deceased person should be disposed of, "his debts being first paid."

The act of 1688, cap. 189, (Appen. 10) makes all lands liable to sale, on judgment and execution against the defendant, his executors or administrators.

The act of 1700, makes the same provision, and in the same extensive terms, adding the words, "where no sufficient per-"sonal estate is to be found." Prov. Laws, ed. 1775, pa. 6.

So the act of 1705, for the better settling of intestate's estates, declares in what manner the surplusage of the intestate's estate shall be divided. Prov. Laws, 35, § 8.

The second act of 1705, expressly provides, that all lands shall be liable to be seized and sold, upon judgment and execution obtained. Prov. Laws, 49.

When these different laws were enacted, the colony was in its infancy; lands formed the capital property of our ancestors, and the debts contracted by them were chiefly formed on the purchases of real estates. It was therefore highly just and reasonable, under the then existing circumstances, that lands should be liable for the payment of all debts, and that no testator shall *have it in his power to defeat these wise provisions. Nor is the wisdom of the measure less conspicuous at the present day.  [*558

In the case of Graff v. Smith, the principle is established, that a lien is created on the death of a testator, on lands devised for payment of debts. Dall. 483.

If any doubts could possibly arise on these laws, and after this decision, a legislative exposition by the act of assembly of 19th April 1794, would certainly remove them. The second section of that act, (pa. 523,) expressly recites, that "inconveniences might arise from the debts of deceased per-"sons remaining a lien on their lands and tenements, an "indefinite period of time after their decease, whereby *bona* "*fide* purchasers might be injured, and titles become in-"secure;" and makes certain provisions to obviate the supposed difficulties.

In England, where a power is given to executors to sell for

[Hannum *v.* Spear.]

payment of debts, a purchaser is not bound to look to the application of the money, unless there is a schedule of such debts.   And where the heir has aliened before a suit brought, the purchaser is secure, · but the heir is subjected by the statute to pay the value.   Our acts of assembly were made for the avowed purposes of preventing creditors from being defrauded, and therefore to attain those ends effectually, must be liberally construed in favour of creditors.   It may be said, that the law creates a lien against the debtor himself, but not against his executors or administrators.   But the obvious answer thereto is, that the creditor reposes a confidence in his debtor, but none in his executors, &c. and the most proper period for the lien to commence is on the death of the party trusted.   Besides the creditor has a personal remedy against the debtor, but none against his executors.   The condition of a creditor would be much altered for the worse, unless the lands were bound from the decease of the person indebted to him.   An executor may be poor and dishonest, and waste or run away with the money.   So of the heir, and though neither of them have been trusted by the creditor, he runs the risque of them both, and thereby may be deprived of his just dues.

It may further be said, that a power to executors to sell, may be necessary to answer family purposes, and that it would be unreasonable to deprive a person of the power of creating a trust.   But it is clear, that although a man has such power, he cannot exercise it at the expence of his creditors.   His property must be subject to their fair demands, and though some evils may arise from a sheriff's sale being more expensive than that of executors, they can only hold, where sales are necessary for payment of debts.   If the purchaser amongst us, is not bound to see * to the application of the money, *559] legatees may be preferred to creditors.   Executors may prove insolvent, and the interests of creditors be effectually defeated thereby.

It is admitted, that a creditor may levy his debt on the lands of a devisee, or of his alienee.   And why may he not levy on lands in the hands of purchasers from others, who have bought from executors, vested with an authority of selling?   In the case of dower, a *bona fide* purchaser without notice, shall not hold the lands exempt from the claim of the widow.   A purchaser may protect himself, by inquiring whether any debts of the deceased remain unpaid; and if his mind is not fully satisfied on the result of his labour, may demand security from the executors, before he completes his contract; but a creditor has no earthly mode of making himself secure.   To favour the interests of a particular legatee, executors may privately sell the most valuable lands at an under-rate, without any controul on the part of the creditors.

It may likewise be objected, that the legislature have given

[Hannum v. Spear.]

power to the Orphans' Court to direct the sale of intestates' lands in certain cases; and that having made no such provisions in the case of wills, they must be supposed to have left it to testators to give such direction themselves. To this it is answered, that let the law be as it may, with respect to powers granted to executors to sell for payment of debts, this is the case of an authority to sell for payment of legacies. Perhaps a power to executors to sell at such time as they may think proper, may amount to a devise to executors, with an authority to sell.

The bill of exceptions states, that the testatrix died possessed of more personal property than was sufficient to pay her debts. She does not appear to have designed that the Indian Fields Tract should be sold to discharge her debts. On the contrary, she has charged one plantation with the payment of 300l., and another with the whole amount of the mortgage money. To vest testators with the uncontrolled right of ordering lands to be sold for the payment of legacies, would deprive creditors of their debts, be destructive of credit, and introductive of fraud. One indebted cannot convey in trust, or otherwise, without a valuable consideration. A purchaser with notice of a trust must hold the lands subject to the trust. If the trust appears in any of the title deeds, he is bound to see to it. In this case, the power appeared in the will, and to be for payment of legacies; and therefore, as Hannum was bound to look at the will, he had notice of the trust.

The executors were the trustees of the legatees; and it is immaterial whether the words of the will made them devisees, or *gave them a mere authority to sell. It will not [*560 be contended, that lands cannot be taken in execution in the hands of devisees. If there is a mere authority to sell, the purchaser necessarily comes in under the testatrix, and the result would be, that she undertakes to sell for the benefit of legatees, her debts being unpaid.

Moreover, the executors were trustees, and must pay legacies and not debts. They could not sell without power, and they were bound to pursue the power, by paying legatees. The money arising on the sale of the lands in question could not go into their hands as chattels, or assets, for the payment of debts. To say that lands are chattels for the payment of debts, is by no means an accurate expression, for then the executors or administrators might sell lands, without any power given to the former by will, or to the latter by order of court, which it will not be pretended that either of them can do legally.

The defendant's counsel stated the matter before the court to rest on a single question, whether when an executor sells lands pursuant to a power granted by the will, such lands are

[Hannum v. Spear.]

liable to be taken in execution in the hands of a *bona fide* purchaser, for the payment of the debts of the testator?

If one cannot by will direct the sale of his lands for family purposes, it would be highly inconvenient; it would be in effect to say, that one shall not order his lands to be sold, and that he must necessarily submit to the delay and expence of having them sold by the sheriff.

Whatever may be done circuitously, may be done directly. If it may be done by deed, so may it by will. One may convey his land to trustees, to permit him to take the profits during his life, and after his death to sell them for the payment of his debts or legacies; and yet such trustees in general, could not be compelled to give security. If the same object may be obtained in another mode, by will, and at less expence, why may it not be done? Bacon's Law Tracts, 93. A will of land is considered in nature of a conveyance to uses. It is a species of conveyance. 2 Black. Com. 378. It operates by way of appointment, 2 Woodeson, 348, and therefore, must be considered as taking effect from the date of the will, and this is the true reason why lands acquired after the making of a will, cannot pass thereby. Cowp. 90.

It is however objected, that this power may be abused by executors; that a testator may direct his lands to be sold and the money given to children, &c. that executors may be dishonest, or become insolvent, &c. Yet may not lands be sold *561] to satisfy *a feigned debt, on the application of dishonest administrators to an orphans' court; and after sale, may they too not waste the money, run away and become insolvent? It will be admitted on all hands, that in case of fraud and collusion, either in the sales of executors or administrators, that their proceedings would be thereby invalidated.

Trusts created in wills are favoured by the law. 21 Vin. 505, pl. 1. Courts of justice encourage provisions made by testators for the payment of their debts. 1 Vez. 215. Devises of lands in England are void against creditors by specialty, by stat. 3 and 4 W. and M. c. 14. And yet a devise for payment of debts is held to be out of the statute. 2 Vez. 590. So though all devises of lands where the heir is bound, are void, yet it has been adjudged, that a devise for payment of debts, is not affected thereby. If the bond creditor commencing his suit in England creates the lien, and convenience has been derived there from it, why should we not adopt the same principle here? Where executors there sell under a power in a will for payment of debts, creditors can have no recourse against a purchaser, who is not bound to see that the money be properly applied, unless there be a schedule particularizing the debts. Ambl. 188. Gilb. Chan. 320, 2 Vez. 587. Prec. Cha. 397. Cha. Ca. 249. And if the purchase is fairly made, though the executors waste the money, a creditor cannot pursue the lands.

[Hannum *v.* Spear.]

It is insisted upon, that such a power vested in executors is inconsistent with our acts of 1700 and 1705. It is answered, that the first of these laws only makes lands liable for the payment of debts, and the latter is little more than a repetition of the same thing, and that the object of the legislature went no further than to make lands chattels for the payment of debts. It is not contended, that executors or administrators have the same power over real estate, that they have over personal property, but merely, that they form a part of the assets of the deceased in case of the deficiency of the latter fund. Consequently the rules respecting both species of property in the present particular, should be uniform; and inasmuch as the personal assets of a testator cannot be followed in the hands of a fair purchaser, for valuable consideration, 1 Atky. 463, 2 Atky. 41, so neither should lands *bona fide* sold by execution, under a proper power.

There is no principle laid down in the decision of Graff *v.* Smith, (Dall. 48,) which can affect the question before the court in favour of the plaintiffs in error. It is there said, that the lands whether of a testator or intestate, are made a fund for the payment of debts. The heir or devisee not being liable to give security, the creditors would be defrauded unless they could fol*low the lands in the hands of a purchaser, to whom the heir or devisee would immediately sell them. This reasoning does not apply to a trustee executor. Again, in pa. 486, purchasers under orders of Orphans' Courts, are safe, though the money be squandered; the administrator has as much power to sell the specified lands, as he has to sell chattels. [*562

An administration bond is always calculated with reference to the personal estate. But the Orphans' Court, on directing a sale of real estate, may oblige the administrator to give security, to apply that money properly. There is not that security in the heir or devisee, which is attributed to an executor, whom the law supposes to be worthy of trust. But if executors acting under such a power, can be compelled to give security, there is a complete analogy between such sales made by them, and those made by administrators under an order of Orphans' Court.

In case of the probable insolvency of an executor, he may be compelled to give security. Dall. 483. And the Orphans' Court, which in this instance resembles a Court of Equity, may on good grounds, compel the executor trustee, before he enters on his trust, to give security, as well as afterwards. Chancery, where the executor is considered as a trustee, will call upon him to give security, in case of probable insolvency. Lovel. on Wills, 190. And in some cases, an executor may be called upon to give security to pay a legacy. Ib. 213. Cites 2 Bac. Abr. 377. 1 Cha, Ca. 121, Law of Testam. 187. 1 Rol. Abr. 285.

[Hannum *v.* Spear.]

In the case before the court, it appears that there were minors interested; and under such circumstances, executors and trustees may be called on to give security. (Prov. Laws 71. § 3.)

The powers given to the Orphans' Courts to direct the sale of intestate's lands, in order to pay debts and bring up children, are only substitutions for the usual powers given to executors by wills.

Again, it is objected, that the power given here to the executors to sell, is for the payment of legacies and not of debts.

It is answered, that the testatrix has expressly provided for the payment of her debts, and the expence and inconvenience which will be incurred in obliging creditors to sue for their debts, will be equally experienced by the legatees, who must sue for their legacies. When the money produced by a sale of lands, comes into the hands of the executors, it is a fund for the payment of creditors, who will be paid in preference to legatees.—Besides, the legatees are not entitled to their monies until they offer refunding bonds with security to the executors; and these bonds can be recurred to in case future debts appear. Devise of *real estate to trustees to sell, and pay debts and legacies generally, the trustees sell and embezzle part of the money, the purchasers are not liable to the debts. Ambl. 188.

*563]

The question before the court will ultimately result in this inquiry, which construction of the acts of assembly will be most expedient, and attended with the fewest inconveniences, as well to creditors, as legatees? It is submitted, that the construction contended for by the defendant, gives creditors an equal security with that opposed to them, promotes the interests of legatees, saves great delays and much expence. The general practice and sentiments of the people of the state, it is also hoped, is with the defendant on the present question. *Curia advisare vult.*

And now on the 16th September 1795, the Court of Errors and Appeals proceeded to give their opinions *seriatim.*

Chew President, stated the different facts set out in the bill of exceptions, and then observed as follows in substance:

The Judges at Nisi Prius ruled, that the demand of Thomas Gibson and Hannah his wife, was not a lien on the lands sold to James Hannum by the executors, under the power given to them by the will of Elizabeth Ring, and that nothing short of mortgages and judgments against their lands, anterior to the sale, would have operated as a lien.

The nature and legal operation of the power granted to the executors, is the most material point to be considered; whether the authority was given to them, for the payment of the debts, or legacies of the testatrix. If that power was vested in them for the former purpose, I should strongly in-

[Hannum *v.* Spear.]

cline to think, that the sale would have transferred to the purchaser, a good title, exempted from the debts of the testatrix, unless there had been a schedule directing the appropriation of the money to particular creditors. Usage best expounds a law; and such numerous sales of this description have been made in Pennsylvania, and the titles to the lands thus *bona fide* sold have never been questioned, that it would now be dangerous to impeach them. The execution of powers of this nature, has proved highly beneficial to creditors, and has greatly conduced to the interests of the representatives of the parties deceased. But I would not be understood to have a decided opinion on this point: I view the present case, as a power devised for the payment of legacies, and not of debts.

Elizabeth Ring by her will, charged the lands devised to Jacob Chandler with the payment of the mortgage money due to the representatives of Joseph Parker, and the plantation whereon she lived, to Joseph Spear, with the sum of 300l. The In*dian Field Tract, she orders her execu- [*564 tors to sell, according to their best discretion, and to divide what will remain from the sale, in proportion among the legatees, after all the legacies are paid. She had previously bequeathed legacies amounting to 380l. to several persons in different proportions. "What will remain from "the sale" can only mean the surplus, after paying those particular pecuniary legacies. The legatees therefore were the sole objects of her bounty, in this clause of her will, whereon the question arises, and her executors had no power to sell for the payment of debts; consequently, the lands remained liable to the claims of her creditors, and their liens continued as fully, as if there had been no sale. As the executors therefore, could not under their sale, give a good title to Hannum, freed from the demands of the creditors of the testatrix, I am of opinion the consideration of the bond failed, and that the executors were not entitled by law to recover thereon, and that the judgment in the Supreme Court be reversed.

Shippen, J. Two points arise in this case. 1. How far lands in Pennsylvania are bound to satisfy the debts of deceased persons. 2. If they are bound, how far a devise of the debtor's lands, to pay his debts or legacies, will interfere with that principle.

Restraints on the alienation of real property in England, were co-eval with the feudal system. The favourite of that system, next to the lord, was the heir at law. Without his consent, as well as that of the lord, the feudatory could never transfer his estate to another, and he could in no case subject his lands to the payment of his debts. It was by slow degrees, that these feudal obligations were impaired; and to this day, they are not wholly removed; for a moiety only of

the lands of the debtor, is subjected to the execution of his creditor, in England.

Our ancestors, the first inhabitants of Pennsylvania, viewing this system in its true light, and seeing the wisdom as well as justice of subjecting every kind of property to the payment of debts, made it one of their first articles, which they called laws agreed upon in England, before their embarkation to this country, that land should be subjected to pay their debts. This law they confirmed immediately after their arrival here, by the act of union, passed at Chester, in the month of December 1682.

In a few years after, they enabled executors and administrators, by conveyance or bill of sale, with the approbation of the court, to sell the lands of a deceased debtor, for the payment of his debts. It was an object they never lost sight of. The first laws upon that subject, having excepted the *565] case of a man's hav*ing legal issue, in which case only half the lands were made liable to debts, they at length took off even that restraint; and by the act of 1700, in order, as the legislature expresses it, that no creditors may be defrauded of their "just debts," they expressly enact, that "all lands and houses whatsoever," should be liable to sale, upon judgment and execution, to satisfy creditors. It was no longer in the discretion of widows, executors or administrators, to sell the lands of deceased persons by conveyance or bill of sale; but to complete their intention that no creditors might be defrauded of their debts, the sales were to be only by execution under a judgment. Is it possible to conceive, that with all this just care of creditors, the legislature should ever mean to leave it in the power of heirs or devisees, by the flimsy expedient of selling the lands of the deceased, before judgment could be obtained against the executor or administrator, entirely to defeat the whole system of their laws in favour of creditors, whose interests they had thought proper to prefer, even to the minor children of the deceased?

It has been suggested, that nothing appears in our acts of assembly to make lands assets for the payment of debts, in any other manner than goods and chattels were assets at law in the case of deceased persons. It is apparent from the whole tenor of the acts of assembly, that the legislature meant to afford the creditor equal security for his debt, in the lands of deceased persons, as in his goods and chattels. As to the latter, they are confessedly bound from the death of the debtor; they immediately go into the hands of the executor, or he has an immediate right to reduce them into his possession, and they, or the produce of them, are bound to discharge the debts of the creditor. As to the lands, the executor as such, has neither possession of them, nor power over them, nor is in any sort responsible for them; they are indeed by a kind of fiction, supposed to be in his hands, because the exe-

cution directs the debt to be levied "upon the goods and "chattels, lands and tenements of the deceased, in the hands "of the executor." But really and in fact, they are, till sold by execution, in the hands of the heir or devisee; and if the legislature meant lands to be a fund, equally with goods and chattels, for the payment of the debts of deceased persons, they must have meant, that they should be bound in the hands of the heir or devisee, in the same manner, and from the same time, as goods and chattels are bound in the hands of the executor; otherwise they would amount to no fund at all, as they might be disposed of by the heir or devisee, at any time before judgment against the estate of the testator. It could surely never be the meaning of the legislature, to mock the creditors, with the prospect of so precarious a fund as this!

* At the bar, however, this point does not seem to be [*566 seriously contested; indeed, since the act of April 1794, how can it now be contested? For although the act has no retrospection, yet the legislature strongly recognizes the principle, that the lands of deceased debtors are bound from the time of their deaths, not only by the strongest negative implication, when they say that the lien shall not continue longer than seven years after the decease of the debtors, but positively and expressly, by saying that their lands shall be subject to the lien of infant, absent, or *non compos* creditors, for seven years after those impediments shall be removed; so that I take it, this question is now entirely at rest.

The next point to be considered is, how far it is consistent with the above principle, that testators may by their last wills and testaments, direct their lands to be sold for the payment of their debts, for the payment of legacies, or for any other purpose? And although there is not the same necessity here as in England, to exercise the testamentary power in order to do justice to creditors, because, without such kind of devises, the whole real estate in that country would be swept away from the creditors by the heir at law, except in cases of obligations, and other specialties wherein the heir is expressly bound; yet there undoubtedly may be cases where there would be the utmost propriety, as well as necessity, for the exercise of a similar power here, as well for the more easy and fair distribution of a testator's estate among his children, as for saving the expence attending the recovery of judgments, and selling their real estates by execution. And I see no good reason for limiting or restraining the power in any case, which does not militate against the principle of the lands being expressly charged by law with the payment of the testator's debts in the first instance; as if a testator devises his lands to be sold by his executors for the payment of his debts, and the executors sell the lands and pay the debts with the proceeds of the sale; and especially if in doing that, they do not vio-

late the directions of the law as to the priority and dignity of debts. I see no more reason, why the purchaser from the executors should be disturbed in his possession of the lands, by any unsatisfied creditor's issuing a subsequent execution against them, than a purchaser under a sale at the suit of a prior mortgagee can be disturbed by a second mortgagee, where the land did not sell for more than was sufficient to satisfy the first. In both cases the fund is fairly exhausted, and no injustice done, nor law infringed. But this does not appear to me to be the case, where the testator directs his land to be sold for payment of legacies. A purchaser from executors under such *a power, must know or ought to know, that in the first instance the land is charged by law with the payment of the testator's debts; that he was bound to be just before he is generous; and that although a testator unincumbered with debts, might legally give such a power to his executors, yet it is impossible for him to do it, to the prejudice and exclusion of his creditors, who have a legal security in the land. The testator in his life time, if indebted could not make a gift, or execute a voluntary conveyance of his land; such a gift or voluntary conveyance would be deemed fraudulent as against creditors. If this could not be done in his life time, *a fortiori* he could not do it by his last will, which does not take effect till his death, from which moment it is pledged by law to those creditors.

It has been contended, that when a testator devises his land to be sold by his executors for any purposes whatsoever, even for the payment of legacies, yet, when the money arising from the sale comes into the executors' hands, it will be considered as assets, out of which the debts must be first paid. To this I answer, that under such a devise, the executor is a trustee for the particular purpose mentioned in the will, and he is authorized to sell for that purpose only. The power might as legally have been given to another person as to the executor; and how in that case could the produce of the sale be considered as assets for the payment of debts? The executor, as executor, has nothing to do with the land; and as a trustee, he must be considered in the same light as if he was not executor; unless in the case of a devise to pay his debts, in which case he is a trustee for the creditors. Upon a contrary idea, the executor selling land for the payment of legacies, must appear in a truly ridiculous situation. As an executor, it is said, he is bound to pay the debts out of the money raised by a sale, under a power to sell for the benefit of legatees; and as a trustee for those legatees, he is compelled to commit an express breach of trust by paying those debts. I can find no instance in the books of a devise of a power for the sale of land for the payment of legacies, where the produce of such sales was ever considered assets for the payment of debts; although in every case that can possibly bear the

_Hannum _v._ Spear.]_

construction of a devise for the payment of debts, the judges appear inclined to give that construction, for this evident and just reason, that, unless it be under such devises, the lands cannot be made subject to the payment of debts. There is certainly greater reason in this country to comply with the will of the testator, and not to divert his intention, as no injustice can possibly be done to his creditors by it, they having a prior legal security in the lands.

\* For these reasons, I think the sale by the executors of Elizabeth Ring to James Hannum could not have ⌐ \*568 entitled him to hold the land, against the judgments and executions of creditors; and as he could not be secured in his title, he had a good defence against the action brought on the obligation; and consequently, that the judgment should be reversed.

Smith, J. Before the argument, I stated to my brethren and to the counsel concerned, that if the general question, whether the debts of a testator be a lien on lands sold by his executors pursuant to a power in his will, in all cases, must be determined in this case, I should not probably think myself at liberty to give an opinion thereon, unless the distinctions which had occurred to me, and agreeably to which I had acted, should be taken, viz. that all debts secured by mortgage or judgment, as well as specified and scheduled debts are so far liens, as that the purchaser is to see that the consideration money is duly applied to the payment of these debts in due order. The reason I mentioned this was, that I as executor, sold lands of the testator, and would have sold more could I have done it to advantage, and paid part of divers judgments with the money. I divided it nearly in proportion to those I did pay, but it was so small a proportion of the whole, that to several judgments for inconsiderable sums, I did not take the trouble of paying any. This was done at a time, when I believed that the estate would not be sufficient to pay all the debts. I might therefore be supposed to be under the influence of prejudice, and of having in fact prejudged the point in a certain degree.

The general position was brought before the court, and the distinctions not made at the bar; consequently, I do not think myself at liberty to go into a regular discussion of the question. But as the judges who have spoken before me, think it necessary that I should declare my opinion, I have no hesitation in saying, that I join in the opinion delivered by the president. I think, that the purchaser of lands sold _bonâ fide_ by an executor, pursuant to a power given in the will, is bound to see that the purchase money is duly applied to the payment of such debts as I have mentioned; but his title cannot be affected by other creditors, there being no collusion between the purchaser and executor, but the sale being fair, open and regular. Many titles depend on such sales; their

[Hannum *v.* Spear.]

legality has never been disputed, and it is for the benefit of all parties that they should be supported; the inconveniences can neither be great nor frequent.   However in strictness, it is not necessary to decide this point in the present case, because the power given by the will, was to sell for the payment of legacies; the testatrix having having devised other parts of *her estate to her executors respectively; to wit, *569] one part to Jacob Chandler, subject to the payment of this very mortgage, under which he permitted the land in question to be sold, after he had joined in the sale of it to Hannum, and another part to Joseph Spear, subject to the payment of 300l. in addition to what he had paid before.

Could the executors make a good title to Hannum by this power, and under these circumstances?   I think not.   For were these devises to the executors even out of the question, they had only a naked power by the will to sell the lands, and divide the residue of the purchase money amongst the legatees, after the payment of the particular pecuniary legacies. This power to sell for the payment of legacies, like all other naked powers, ought to be strictly pursued.   It was not even substantially pursued; the sale was made for the payment of debts.   The executors had no power given to them to sell for this purpose, and could not give the purchaser a good title; consequently, he was not obliged to pay the purchase money.

It may be necessary to add, that this point did not come before the court at *Nisi Prius*   Had the land been sold under this power in the will, and the money applied to the payment of debts in the first place, and after the debts were discharged, to the payment of legacies, I incline to the opinion, that the purchaser's title would have been good against the heirs and devisees.   If the purchase money was not sufficient to pay all the debts, I will not give any opinion, as at present advised, whether if the consideration money was paid in due degree, so far as it would extend, an unsatisfied creditor might on a judgment obtained against the executors, have proceeded to levy on the lands.   The judgment here must be reversed.

Biddle J.   I am of opinion, that under a power granted to executors by will to sell lands for the payment of debts, the vendee would obtain a good title, unless prior mortgages, judgments or recognizances, bound the land; but I also think, that under a mere power to sell for the payment of legacies, as in the present instance, the purchaser could not defend himself against the creditors of the testator, though such creditors were not secured by prior mortgages or judgments.   I will only observe, that this ground was not taken at the trial.

Judgment reversed.

[M'Kean C. J. and Yeates J. sat during the delivery of the preceding opinions, one of them at least being necessary to form the court, but neither of them gave any opinion.]

[Hannum *v.* Spear.]

Explained in 13 S. & R., 262.

Cited in 8 Pa., 128, in support of the proposition that when lands are sold by an executor under a power to sell for payment of debts, the purchaser takes the land discharged of the lien.  ·

Referred to in 10 Pa., 268 ; 28 Pa., 50 ; 43 Pa., 153.

\*AT NISI PRIUS, AT EASTON,          [\*570